IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

KAREN LESTER-MAHAFFEY,                          Case No. 3:15-cv-00929-YY

           Plaintiff,

                                            OPINION AND ORDER

        v**.**

COMMISSIONER OF SOCIAL SECURITY,

           Defendant.

_____

YOU, Magistrate Judge:

## **INTRODUCTION**

      Plaintiff, Karen Lester-Mahaffey, seeks judicial review of the final decision by the Social

Security Commissioner ("Commissioner") denying her application for Disability Insurance

Benefits ("DIB") under Title II of the Social Security Act ("SSA"), 42 USC §§ 401-33.   This

court has jurisdiction to review the Commissioner's decision pursuant to 42 USC § 405(g) and §

1383(c)(3).   All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c) (ECF #24).   Because the Commissioner's decision is not supported by substantial evidence, it is REVERSED AND REMANDED for an immediate award of benefits.

## ADMINISTRATIVE HISTORY

Lester-Mahaffey has filed two applications for DIB alleging an onset date of April 18, 2007.   She filed her first application on September 5, 2007.   Tr. 70.   Her application was denied initially and on reconsideration.   On July 7, 2010, a hearing was held before Administrative Law Judge ("ALJ") Richard Say.   The ALJ issued a decision on July 15, 2010, finding Lester-Mahaffey not disabled.   Tr. 69-82.   The Appeals Council denied a request for review. United States District Judge Ann L. Aiken affirmed the Commissioner's decision.   The United States Court of Appeals for the Ninth Circuit affirmed Judge Aiken's decision on February 10, 2016.   *Lester-Mahaffey v. Comm'r Soc. Sec. Admin.,* No. 13-35469 (9th Cir Feb. 10, 2016).

On April 13, 2011, Lester-Mahaffey protectively filed a new DIB application, which is the application at issue in this case.   Tr. 200-02.[1]   On June 25, 2013, a hearing was held before ALJ Steve Lynch.   Tr. 43-66.   The ALJ issued a decision on July 10, 2013, finding Lester-Mahaffey not disabled.   Tr. 18-41.   The Appeals Council denied a request for review on March 30, 2015. Tr. 1-4.   Therefore, the ALJ's decision is the Commissioner's final decision subject to review by this court.   20 CFR §§ 404.981, 422.210.   The time period at issue here is July 16, 2010, through Lester-Mahaffey's date last insured of March 31, 2012.   Tr. 21, 46-47.

///

---

[1] Citations are to the page(s) indicated in the official transcript of the record filed on November 6, 2015. (Docket # 13).

## BACKGROUND

Born in 1964, Lester-Mahaffey was 49 at the time of the hearing before the ALJ.   Tr. 48.

She received a Master's degree in social work in 2002 and past relevant work experience as an

addiction therapist, a child welfare advocate coordinator, a Montessori school teacher, and a

volunteer coordinator.   Tr. 48, 63, 384, 981.   Lester-Mahaffey alleges that she is unable to work

due to the combined impairments of major depression, anxiety, and chronic low back pain.   Tr.

115, 236.

## DISABILITY ANALYSIS

Disability is the "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12 months[.]"

42 USC § 423(d)(1)(A).   The ALJ engages in a five-step sequential inquiry to determine whether

a claimant is disabled within the meaning of the Act.   20 CFR § 404.1520; *Tackett v. Apfel*, 180

F3d 1094, 1098-99 (9th Cir 1999).

At step one, the ALJ determines if the claimant is performing substantial gainful activity.

If so, the claimant is not disabled.   20 CFR § 404.1520(a)(4)(i) & (b).

At step two, the ALJ determines if the claimant has "a severe medically determinable

physical or mental impairment" that meets the 12-month durational requirement. 20 CFR §

404.1520(a)(4)(ii)&(c).   Absent a severe impairment, the claimant is not disabled.   *Id.*

At step three, the ALJ determines whether the severe impairment meets or equals an

impairment "listed" in the regulations.   20 CFR § 404.1520(a)(4)(iii) & (d); 20 CFR Pt. 404

Subpt. P, App. 1 (Listing of Impairments).    If the impairment is determined to meet or equal a listed impairment, the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC").    The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments.    20 CFR § 404.1520(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work.    20 CFR §§ 4104.1520(a)(4)(iv) & (e).    If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the claimant can perform other work in the national economy.    *Bowen v. Yuckert*, 482 US 137, 142(1987); *Tackett,* 180 F3d at 1099; 20 CFR § 404.1520(a)(4)(v) & (g).

The initial burden of establishing disability rests upon the claimant.    *Tackett,* 180 F3d at 1098.    If the process reaches step five, the burden shifts to the Commissioner to show that jobs exist in the national economy within the claimant's RFC.    *Id.*    If the Commissioner meets this burden, then the claimant is not disabled.    20 CFR § 404.1520(a)(4)(v) & (g).

## **ALJ'S FINDINGS**

At step one, the ALJ concluded that Lester-Mahaffey has not engaged in substantial gainful activity since April 13, 2011, the date that the application was protectively filed.    Tr. 21.

At step two, the ALJ determined that Lester-Mahaffey has the severe impairments of degenerative disc disease of the lumbar spine with fusion surgeries, depression, and a panic disorder without agoraphobia.    *Id.*

At step three, the ALJ concluded that Lester-Mahaffey does not have an impairment or combination of impairments that meets or equals any of the listed impairments.   Tr. 22.   The ALJ found that Lester-Mahaffey has the RFC to perform light work, except she can stand and walk for a total of six hours in an eight-hour workday.   She could sit for a total of about six hours in an eight-hour workday.   She needs to avoid unprotected heights and hazards.   She can occasionally climb ramps and stairs, and occasionally balance, stoop, kneel, crouch, and crawl.   She should never climb ladders, ropes, or scaffolds.   She can engage in simple, entry level work.   She should have no interaction with the general public and only superficial interaction with coworkers.   Tr. 23.

Based upon the testimony of a vocational expert ("VE"), the ALJ determined at step four that Lester-Mahaffey's RFC precluded her from returning to her past relevant work.   Tr. 33.

At step five, the ALJ found that considering Lester-Mahaffey's age, education, and RFC, she was capable of performing the work of a janitor and small products assembler.   Tr. 34.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on proper legal standards and his or her findings are supported by substantial evidence in the record.   *See* 42 U.S.C. § 405(g); *Lewis v. Astrue,* 498 F3d 909, 911 (9th Cir 2007).   This court must weigh the evidence that supports and detracts from the ALJ's conclusion.   *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), *citing Reddick v. Chater,* 157 F3d 715, 720 (9th Cir 1998).   The reviewing court may not substitute its judgment for that of the Commissioner.   *Ryan v. Comm'r of Soc. Sec. Admin.,* 528 F3d 1194, 1205 (9th Cir 2008), citing *Parra v. Astrue,* 481 F3d 742, 746 (9th Cir 2007); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001).   Where the evidence

is susceptible to more than one rational interpretation, the Commissioner's decision must be upheld if it is "supported by inferences reasonably drawn from the record.'" *Tommasetti v. Astrue,* 533 F3d 1035, 1038 (9th Cir 2008), *quoting Batson v. Comm'r of Soc. Sec. Admin.,* 359 F3d 1190, 1193 (9th Cir 2004); *see also Lingenfelter,* 504 F3d at 1035.

## **DISCUSSION**

### A.    **The ALJ did not err at step two.**

Lester-Mahaffey first contends that the ALJ erred by failing to find migraine headaches a severe impairment at step two   At step two, the ALJ determines whether the claimant has a medically severe impairment or combination of impairments.   *Bowen*, 482 US at 140-41.   The Social Security Regulations and Rulings, as well as case law applying them, discuss the step two severity determination in terms of what is "not severe."   According to the regulations, "an impairment is not severe if it does not significantly limit [the claimant's] physical ability to do basic work activities."   20 CFR § 404.1521(a).   Basic work activities are "abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling."   20 CFR § 404.1521(b).

The step two inquiry is a *de minimis* screening device to dispose of groundless claims. *Bowen v. Yuckert,* 482 US 137, 153-54 (1987).   An impairment or combination of impairments can be found "not severe" only if the evidence establishes a slight abnormality that has "no more than a minimal effect on an individual's ability to work."   *See* SSR 85-28; *Yuckert v. Bowen,* 841 F2d 303, 306 (9th Cir 1988) (adopting SSR 85-28).   A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, and cannot be established on the basis of a claimant's symptoms alone.   20 CFR § 404.1508.

At step two, an impairment can only be established "if the record includes signs–the results of 'medically acceptable clinical diagnostic techniques,' such as tests–as well as symptoms, *i.e.,* [Plaintiff's] representations regarding his impairment."    *Ukolov v. Barnhart,* 420 F3d 1002, 1005 (9th Cir 2005)(quoting Social Security Ruling (SSR) 96-4p, *available at* 1996 WL 374187, at *1 n.2).    The existence of an impairment requires a diagnosis.    Symptoms alone are insufficient. *Id.* at 1005-06.    Only acceptable medical sources may diagnose and establish that a medical impairment exists.    20 CFR § 416.913(a); SSR 06-03p, *available at* 2006 WL 2329939, at *2. "Thus, regardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities; *i.e.,* medical signs and laboratory findings."    SSR 96-4p, at *1.

Lester-Mahaffey argues that the ALJ erred by rejecting migraine headaches as a medical impairment.    However, the ALJ rejected this alleged impairment because it "caused only transient and mild symptoms and limitations, [is] well controlled with treatment[,] or [is] otherwise *not adequately supported by the medical evidence in the record*."    Tr. 21 (emphasis added).

The ALJ did not err in this regard.    The records Lester-Mahaffey cites in which headaches or migraines are mentioned are not medically acceptable clinical diagnoses from acceptable medical sources.    She cites reports from a physical therapist and a naturopath.    Tr. 1079, 1083, 1118, 1120, 1121.    Acceptable medical sources are medical or osteopathic doctors, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists.    20 CFR § 404.1513.

Moreover, when asked at the hearing whether she had any conditions other than degenerative disc disease, depression, PTSD, and a history of obesity that would affect her ability to work, Lester-Mahaffey responded "anxiety disorder," but did not mention headaches or migraines.  Tr. 50.   In her testimony regarding pain, Lester-Mahaffey described back pain but not headache or migraines.   Tr. 59-62.   For these reasons, the ALJ did not err by failing to find migraines a severe impairment at step two.

**B.      The ALJ erred in assessing Lester-Mahaffey's credibility.**

The Ninth Circuit has developed a two-step process for evaluating the credibility of a claimant's own testimony about the severity and limiting effect of the claimant's symptoms. *Vasquez v. Astrue,* 572 F3d 586, 591 (9th Cir 2009).   First, the ALJ "must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged."   *Lingenfelter,* 504 F3d at 1036.   When doing so, the claimant "need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom."   *Smolen v. Chater,* 80 F3d 1273, 1282 (9th Cir 1996).

Second, "if the claimant meets the first test, and there is no evidence of malingering, "' the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" *Lingenfelter,* 504 F3d at 1036 (quoting *Smolen,* 80 F3d at 1281).   "This is not an easy requirement to meet."   *Garrison v. Colvin*, 759 F3d 995, 1015 (9th Cir 2014).   "The clear and convincing standard is the most demanding required in Social Security cases."   *Id.* (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F3d

920, 924 (9th Cir 2002).    It is "not sufficient for the ALJ to make only general findings; he must state which pain testimony is not credible and what evidence suggests the complaints are not credible."    *Dodrill v. Shalala,* 12 F3d 915, 918 (9th Cir 1993).    Those reasons must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony."    *Orteza v. Shalala,* 50 F3d 748, 750 (9th Cir 1995)(citing *Bunnell v. Sullivan,* 947 F2d 341, 345-46 (9th Cir 1991)(*en banc*)).

The ALJ's credibility decision may be upheld overall even if not all of the ALJ's reasons for rejecting the claimant's testimony are upheld.    *See Batson,* 359 F3d at 1197.    The ALJ may not, however, make a negative credibility finding "solely because" the claimant's symptom testimony "is not substantiated affirmatively by objective medical evidence."    *Robbins v. Soc. Sec. Admin.,* 466 F3d 880, 883 (9th Cir 2006).    "If the evidence can support either affirming or reversing the ALJ's conclusion, we may not substitute our judgment for that of the ALJ."    *Id.*

Effective March 16, 2016, the Commissioner superseded SSR 96-7p governing the assessment of a claimant's "credibility" and replaced it with a new rule SSR 16-3p.    *See* SSR 16-3p, *available at* 2016 WL 1119029.    SSR 16-3p eliminates the reference to "credibility," clarifies that "subjective symptom evaluation is not an examination of an individual's character," and requires the ALJ to consider all of the evidence in an individual's record when evaluating the intensity and persistence of symptoms.    *Id.* at *1-2.    The Commissioner recommends that the ALJ examine "the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record."    *Id.* at *4.    The Commissioner recommends assessing: (1) the

claimant's statements made to the Commissioner, medical providers, and others regarding the claimant's location, frequency, and duration of symptoms, the impact of the symptoms on daily living activities, factors that precipitate and aggravate symptoms, medications and treatments used, and other methods used to alleviate symptoms; (2) medical source opinions, statements, and medical reports regarding the claimant's history, treatment, responses to treatment, prior work record, efforts to work, daily activities, and other information concerning the intensity, persistence, and limiting effects of an individual's symptoms; and (3) non-medical source statements, considering how consistent those statements are with the claimant's statements about his or her symptoms and other evidence in the file.   *See id.* at *6–7.

Here, the ALJ's July 2013 decision was issued nearly three years before SSR 16-3p became effective and there is no binding precedent establishing that this new ruling applies retroactively.   *See Ashlock v. Colvin*, 2016 WL 3438490, *5 n.1 (WD Wash June 22, 2016) (declining to apply SSR 16-3p to an ALJ decision issued prior to the effective date); *but cf., Lockwood v. Colvin*, 2016 WL 2622325, *3 n.l (ND Ill May 9, 2016) (applying SSR 16-3p retroactively to a 2013 ALJ decision).   Because the ALJ's findings on this issue do not pass muster irrespective of which standard governs, the court does not need to resolve the issue of retroactivity.

The ALJ found Lester-Mahaffey "only partially credible" in part because of "significant inconsistent statements made by the claimant suggesting she has engaged in exaggeration."   Tr. 32.   A claimant's inconsistent statements and exaggeration are specific and convincing reasons to discount her credibility.   *Tonapetyan v. Halter*, 242 F3d 1144, 1148 (9th Cir 2001) (in assessing the claimant's credibility, the ALJ may use "ordinary techniques of credibility evaluation," such as

any inconsistent statements in her testimony).   Here, however, the purported "inconsistencies"
cited by the ALJ are not supported by the record.

The ALJ cited several examples of Lester-Mahaffey's inconsistencies, each of which is
addressed in turn below:

1)   The ALJ found that Lester-Mahaffey was not credible due to conflicting statements
she made about losing her job:

> [T]he claimant testified that she lost her most recent job due to
> absences from work and mood swings, however, she reported to her
> therapist she was laid off due to budget cuts.   Ex. B29F/2.

Tr. 32.   In support of this conclusion, the ALJ cited to Ex. B29F/2, which is a Diagnostic
Assessment conducted by Christine Mermilliod, MS, LPC, LMFT, NCC, on November 15, 2010.
Tr. 1097.

The ALJ, however, disregarded the rest of what plaintiff told Mermilliod that day.
Lester-Mahaffey also disclosed, consistent with her testimony, that "she was so depressed that she
wasn't doing her job well anyway."   *Id*.   Additionally, a review of the entire record shows that on
multiple occasions Lester-Mahaffey candidly reported that she had been fired from her job.   For
example, Lester-Mahaffey told Dr. Daphne Maurer on August 15, 2007, that she had been fired
from her job as a CASA volunteer coordinator.   Tr. 382.   She told Abigail Malone on April 20,
2007, that she was fired from her job because "had gotten too vocal in the midst of her depression."
Tr. 389.   She told Donna Wicher, PhD., that she was let go because she was missing work and
made people uncomfortable.   Tr. 1138.   In her Work History Report, Lester-Mahaffey discussed
how her depression caused her to have problems keeping a job, including getting fired:

> Because I've struggled with depression most of my life, I haven't
> maintained any job for very long. I have only been medicated since

> approximately 2001; therefore, my work performance has always
> been under fire and in questions. The lack of concentration and
> mood swings have always made for a hostile work environment
> (those are the words I've been told) and then I'm released from the
> jobs or I quit before I'm fired. This has affected my self-esteem and
> my self-confidence.

Tr. 229.

Her testimony before the ALJ was consistently candid in this regard. She described in detail her short comings and why they led to her termination in that job and others. She explained that she was let go due to absences and mood swings and because she scared her coworkers. Tr. 54. She viewed her interactions with co-workers as conversations, but her co-workers saw them as attacks. Tr. 55. She admitted that she spoke in a derogatory way and was argumentative and criticizing. Tr. 56.

Instead of considering the entire case record, the ALJ focused on one isolated and fleeting reference in a single document and ignored that, on every other occasion; Lester-Mahaffey admitted she had been fired from this job. The ALJ's decision to discredit Lester-Mahaffey's testimony on this basis is therefore unsupported by clear and convincing reasons.

2) The ALJ also found Lester-Mahaffey lacked credibility because she "testified that she could not focus on any activity for more than 15 minutes, but reported to her therapist in November 2010, due to back pain she could not perform any activity for more than two hours." Tr. 32. It appears the ALJ was relying on Lester-Mahaffey's testimony in which she described her back pain in the year leading up to her December 2011 surgery:

> ATTY:        Well, if you – if you took the depression, anxiety,
> and all that out of the mix and we were just going to
> look at your ability to function for the – let's the
> surgery was December 7th, 2011, *so for the year*

|       | *leading up to December 7, 2011, could you have gone to a desk job every day?* |
|-------|-----------------------------------------------|
| LM:   | No.                                           |
| ATTY: | Independent of the psychological impairments – |
| LM:   | Prior to 2011, that surgery?   Absolutely not. |
| ATTY: | Why is that?                                  |
| LM:   | Because I was unable to walk or sit or stand without meds.   I mean, I was on the verge of needing a cane and being on a walker because of the pain level. |
| ATTY: | Could you have concentrated on any task for a third of the day? |
| LM:   | *I couldn't have concentrated on any task for 15 minutes.*   It was profound.   The pain was profound. |

Tr. 61 (emphasis added).   The ALJ compared that testimony with statements Lester-Mahaffey made to Mermilliod on November 15, 2010, when she reported her back pain was "too severe for her to perform any activity for more then 1-2 hours[.]"   Tr. 1098.

The ALJ erred in making this comparison.   Lester-Mahaffey's testimony pertained to back pain she suffered during the one year period *leading up to* her surgery in December 2011. On the other hand, her statements to Mermilliod pertained to an *earlier* time period.

Moreover, during the one year period leading up to her surgery, Lester-Mahaffey consistently reported a high level of pain in line with her testimony.   For example, on January 3, 2011, Mermilliod observed that Lester-Mahaffey appeared to be in "severe pain" and had "great difficulty walking."   Tr. 1115.   Lester-Mahaffey told Mermilliod that she wished for death "if that's the only way to stop the pain."   Tr. 1115.   On January 24, 2011, she returned to see Mermilliod and reported increased back pain.   Mermilliod observed that Lester-Mahaffey was

13  - OPINION AND ORDER

clearly in pain and again had difficulty walking.   Tr. 1116.   On January 31, 2011,

Lester-Mahaffey was again moving with great difficulty and reported that even small tasks seemed

unachievable.   Tr. 1117.   On August 7, 2011, she reported her pain as "10/10."   Tr. 1143.

Thus, contrary to the ALJ's conclusion, Lester-Mahaffey's testimony was actually consistent with

the record.

      3)   The ALJ further discredited Lester-Mahaffey's testimony because she claimed that she

had not been able to work since April 18, 2007, but reported that she was looking for work in June

and November 2010.   Tr. 32, 236.   The ALJ concluded that "[t]his suggests the claimant herself

believed she was able to work during the relevant time period."   Tr. 32.

      The ALJ again failed to consider the entire record.   In support of his conclusion, the ALJ

cited to portions of the record at B30F/9 and B20F/2-3.   The B30F/9 citation contains treatment

notes from Vibrant Family Medicine on June 9, 2010.   On that date, Lester-Mahaffey told Jill

Edwards, ND, that she was "still looking for work."   Tr. 1126.   However, Lester-Mahaffey

continued to report debilitating symptoms on that date.   She reported that she could not stand or

sit for 50 minutes and woke up from pain after sleeping for only 1.5 hours.   *Id*.   She described

that the previous two weeks had been very hard and she felt hopeless and helpless.   *Id*.   Thus,

while Lester-Mahaffey made statements to Edwards indicating that she wanted to work, she also

reported symptoms showing she was unable to work.

      The ALJ's second citation to the record, B20F/2-3, is also incorrect.   It does not contain

treatment notes from 2010.   Rather it contains treatment notes from 2008 and makes no mention

of Lester-Mahaffey's efforts to find work.   Tr. 571-72.   Presumably the ALJ was referring to

Mermilliod's Diagnostic Assessment from November 10, 2010 (B29F/2), in which

Lester-Mahaffey reported she had been unable to find work since 2007.   Tr. 1097.   The ALJ, however, left out a critical portion of the report in which Lester-Mahaffey explained that she would "rather work than be on unemployment, SSI, or other government assistance."   Tr. 1097-98.

The record is replete with other examples illustrating how Lester-Mahaffey wanted to work but had difficulty coming to grips with the fact that she could not work.   For example, on January 3, 2011, she told Mermilliod that she was struggling to accept that she was permanently disabled.   Tr. 1115.   She wanted to believe she could "somehow work anyway or that the back pain will remit."   *Id*.   She was angry that she had done all of the "right things" to assure economic stability" but was in extreme financial straits due to her disability.   Tr. 1116.

The record also shows that when Lester-Mahaffey tried to work, she could not.   She job shadowed various positions but could not complete a four-hour shift.   Tr. 258.   In 2010, she tried shadowing a waitress but could not complete the shift, even though she was not carrying anything.   Tr. 1129.   Contrary to the ALJ's conclusion, evidence that Lester-Mahaffey wanted to work but could not due to her impairments actually supports an allegation of disability.   *Lingenfelter*, 504 F3d at 1038.

4)   The ALJ also found that Lester-Mahaffey's testimony was "dramatic" in contrast to her reports to treatment providers, which were "significantly understated."   Tr. 32.   Each of the examples referred to by the ALJ is addressed below:

(a)   The ALJ took issue with the fact that Lester-Mahaffey complained of pain but was not on any narcotic pain medication, medical marijuana, or over-the-counter pain medication:

> [T]he claimant testified that, prior to her second back surgery, she could not stand or sit without being on medication.   However, the

medical records during the relevant time period show she was never
prescribed any narcotic pain medication, and she did not report
taking any over-the-counter NSAID medication.   The record shows
she had a medical marijuana card for part of the relevant time
period, however, the record does not show she used marijuana
regularly.

Tr. 32.

Again, the ALJ ignored important portions of the record.   With respect to narcotic

medications, Lester-Mahaffey repeatedly explained why she declined to use prescription narcotic

medications.   For example, in January 2011, although she was "clearly in pain," she was

"reluctant to consider" narcotics because she had a history of being overly medicated.[1]  Tr. 1116.

In June 2011, Lester-Mahaffey stated that she was "[n]ot willing to do narcotics as they weren't

helpful and she didn't like [the] side effects."   Tr. 1135.   In August 2011, she reported that

narcotic pain medications were not helpful and she did not like the "high" they gave her or how

much they cost.   Tr. 1143.   In September 2011, Lester-Mahaffey explained that she had tried

narcotic medication, but she received no benefit from those treatments.   Tr. 1159.

Lester-Mahaffey repeatedly provided legitimate explanations for rejecting narcotic medication,

but the ALJ ignored these reasons in his decision.

The ALJ also ignored portions of the record showing that Lester-Mahaffey in fact had used

medical marijuana during the relevant time period.   For example, in June 2011, she was using

medical marijuana for pain and to help her sleep.   Tr. 1135.   In August and September 2011, she

continued using medical marijuana and found it to be somewhat helpful.   Tr. 1137, 1143, 1174.

However, Lester-Mahaffey noted that, while it took away the pain, she felt "drugged."   Tr. 1120.

---

[1] Before moving back to Oregon in 2009, Lester-Mahaffey had been on three pain meds and nine
psych meds.   Tr. 1100.

Dr. McNeill also suspected that marijuana use was contributing to Lester-Mahaffey's memory problems.   Tr. 1324.

Lester-Mahaffey stopped using medical marijuana in November 2011 when her card expired.   Tr. 1167.   She testified that she "didn't have the money" to continue using it.   Tr. 58. Unlike prescription drugs, she could not "get a break" on insurance for medical marijuana.   Tr. 59.   Thus, contrary to the ALJ's conclusion, Lester-Mahaffey in fact had used medical marijuana during the relevant time period.   Legitimate reasons existed for why she stopped using it, including that she could not afford it, it made her feel drugged, and it was possibly contributing to her memory problems.   Those reasons were ignored by the ALJ.

Additionally, the record shows that Lester-Mahaffey indeed used over-the-counter NSAIDs.   For example, in 2010, she reported that she would use four to five pills, once or twice a month if she could not sleep.   Tr. 1120.   To her credit, Lester-Mahaffey also tried alternative treatments to help diminish her pain.   She tried "natural analgesic[s]," including Chinese herbs, which unlike other medications did not leave her with a groggy feeling.   Tr. 1126, 1129.   She tried acupuncture, massage, and physical therapy.   Tr. 1071, 1131, 1159.   Lester-Mahaffey even lost almost half her body weight in an effort to alleviate her back pain.   In 2008, weighed 298 lbs. Tr. 1167.   In 2011, she was down to 156 pounds.   Tr. 1309.   Yet her back pain did not improve. In addition to erroneously discrediting her testimony for failing take pain medications, the ALJ did not consider that Lester-Mahaffey made these significant efforts to alleviate her pain.

(b)   The ALJ found that the record did not support Lester-Mahaffey's testimony that her mental health had deteriorated significantly after her back surgery in December 2011:

> The claimant testified that her mental health deteriorated
> significantly after her back surgery in December 2011. However,

> the medical records are not consistent with this testimony. In fact, the record shows the claimant did not receive any mental health treatment after her surgery in December 2011 until she started care at the Sexual Assault Resource Center and at Cascadia in October 2012. The notes from Cascadia in October 2012 show the claimant reported her medication Lamictal was effective (Ex. B24F/1- 3), and the next month she reported she was more psychiatrically stable at that time than she had been "for a long time."

Tr. 32.   Again, the ALJ did not consider the entire record in arriving at this conclusion.

The ALJ's citation to the record, B24F/1-3, is incorrect.   This citation does not pertain to Cascadia treatment records from 2012; rather it pertains to treatment records from the Coles County Mental Health Center in 2009.   The ALJ was likely referring to Lester-Mahaffey's October 2012 Crisis Assessment Report from Cascadia's Urgent Care Facility, which is marked as B42.   Lester-Mahaffey was referred to Cascadia for a refill of Lamictal.   Tr. 1260.   The fact that Lester-Mahaffey was seeking more Lamictal could be broadly construed, as the ALJ concluded, to mean that the Lamictal was effective.   However, the ALJ ignored other symptoms that Lester-Mahaffey reported to Cascadia at that time.   Specifically, Lester-Mahaffey reported *increased* depression due to her recent divorce, quasi-homelessness (i.e., "couch surfing"), and loss of insurance.   Tr. 1258, 1261.   She thought about killing herself constantly.   Tr. 1260.

Moreover, while the November 2012 treatment notes indicate that Lester-Mahaffey was "the most stable psychiatrically she has been for a long time," they also state she was still "struggling with multiple social stressors," including divorce, loss of insurance, lack of permanent residence, lack of income, and estrangement from her family, as well as significant anxiety and depression.   Tr. 1261, 1263.   Additionally, as Lester-Mahaffey testified, given her experiences as a victim of multiple sexual assaults,[2] "stable" is a "relative term":

---

[2] Lester-Mahaffey is the victim of multiple sexual assaults, as both a child and an adult.   Tr. 383,

> I would definitely say it hasn't gotten better.   And I do believe that
> "stable" is very – a relative term. I haven't attempted suicide, if
> that's, you know, worthy of being – saying it's stable. While I do
> contemplate that, it –

Tr. 52.   Indeed, the November 2012 Cascadia report indicates that Lester-Mahaffey's mood was

anxious and depressed, and she continued to experience suicidal ideation.   Tr. 1263, 1265.   She

continued, as she had in the past, to "struggle[] to do what needs to be done" and had difficulty

leaving the house.   Tr. 1265.   When reviewed carefully, the November 2012 Cascadia report

shows that Lester-Mahaffey's symptoms of depression, anxiety, and PTSD were as fully in force

then as they had been in the past.

The ALJ also incorrectly noted that Lester-Mahaffey had begun attending counseling at the

Sexual Assault Recovery Center ("SARC") since October 2012.   In fact, she been attending

counseling there weekly since September 5, 2012, and was also attending survivor groups.   Tr.

1261, 1359.   Lester-Mahaffey's counselor described that she was "proactive in her attempts to

seek help," showed "a lot of determination to persevere," and attended counseling regularly.   Tr.

1359.   Her depression, however, was manifesting itself in "extreme" ways and her mental health

was a barrier to procuring stability.   *Id.*

Finally, the ALJ placed too much weight on the fact that there are no mental health

treatment records between the time of Lester-Mahaffey's surgery in December 2011 and

September 2012 when she began seeking treatment at SARC.   Records show that

Lester-Mahaffey was recovering from surgery for at least a portion of that time.   She also had

insurance problems.   In April 2012, she complained that she could not find a counselor because

her insurance was based in Illinois and there were no network providers in Oregon.   Tr. 1313.

398, 588, 1098.

 19  - OPINION AND ORDER

In July 2012, she lost her insurance.    Tr. 50.    Even before losing her insurance, her financial situation had been otherwise grim.    In 2011, she reported to a mental health provider that she did not know how she would pay for continued treatment sessions or her "bills next month."    Tr. 1115, 1116.    Disability benefits may not be denied because of a claimant's failure to obtain treatment she cannot afford due to lack of funds.    *Orn v. Astrue*, 495 F3d 625, 638 (9th Cir 2007).

As discussed above, the ALJ repeatedly ignored and mischaracterized portions of the record.    The ALJ's conclusions regarding Lester-Mahaffey's credibility are therefore not supported by specific, clear and convincing reasons.

## **ORDER**

If an ALJ has improperly failed to credit a claimant's testimony, a district court must credit that testimony as true and remand for an award of benefits if the following conditions are satisfied: (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand. *Garrison v. Colvin*, 759 F3d 995, 1020 (9th Cir 2014).    The court also must independently reviewed the entire record and find no basis for serious doubt that the claimant is disabled.    *Id.* at 1023.    This "credit-as-true rule" is designed to achieve fairness and efficiency, avoid duplicative hearings, minimize administrative burden, and reduce delay and uncertainty for deserving claimants who "suffer from painful and debilitating conditions, as well as severe economic hardship."    *Id*. at 1019.

Here, the record has been fully developed.   Moreover, as discussed at length above, the ALJ failed to provide legally sufficient reasons for rejecting Lester-Mahaffey's testimony.

Additionally, if Lester-Mahaffey's testimony is credited as true, the ALJ would be required to find her disabled.   Lester-Mahaffey described her life as a "roller coaster": one day is "pretty decent" but is followed by many days that are "non-functional."   Tr. 56.   She testified that she experiences three to four "non-functioning" days per week.   On those days, she barely gets dressed and is unable to take care of basic hygiene or household tasks, including paying bills and housecleaning.   Tr. 57.   She does not answer her phone or the door, does not leave the house, and does not even turn on the television because she is painfully sensitivity to sounds.   Tr. 57-58.   When she is able to leave the house, she is "on hyper-aware mode" about who is around her, where the bathrooms are, and where the exits are.   Tr. 267.   She avoids large crowds, which cause panic attacks.   *Id.*   She shops at 4 a.m. to avoid people.   Tr. 1120.   She hates being touched by people, and being around them is "super stressful and highly anxiety provoking" so she minimizes her interactions.   Tr. 267, 290.   She claims the frequency of her non-functioning days precludes her from holding a job.   In fact, she has been terminated from jobs due to her absences from work. Tr. 54, 1138.

Lester-Mahaffey's most recent mental treatment provider corroborated that her symptoms are consistent with her mental health diagnosis.   According to her treating counselors at SARC, Lester-Mahaffey's symptoms are the result of "an extensive history of complex trauma including abuse as a child, multiple sexual assaults, and abuse as an adult resulting in post-traumatic stress, severe depression, anxiety, and suicidal ideation (including a previous attempt)."[3]   Tr. 1359.

---

[3] In 2004, Lester-Mahaffey was hospitalized for one week for suicidal ideation and deep depression.   Tr. 334, 398.

Lester-Mahaffey's depression "manifests itself in extreme and often unpredictable anhedonia [i.e., inability to feel pleasure], binge eating, and *days of isolation*," which are "*normative responses to trauma*."[4]   *Id.* (emphasis added).

The ALJ gave "little weight" to this opinion because he found it "inconsistent with the medical record from September 2012 and continuing."   Tr. 31.   Specifically, the ALJ noted that in November 2012, Lester-Mahaffey reported that her mental health was stable.   *Id.*   As discussed above, however, the ALJ was mistaken in analyzing this portion of the record.   *See supra,* pp. 18-19.   As Lester-Mahaffey explained, stable is a "relative term," given her history as a sexual assault victim.   Furthermore, her Cascadia records from November 2012 indicate that she continued to struggle with multiple stressors and had suicidal ideation.   Tr. 1263, 1265.   In fact, in October 2012, she thought about killing herself constantly.   Tr. 1260.

The opinion of Lester-Mahaffey's SARC counselors is also consistent with treating physician Dr. Daphne Maurer's opinion in 2008[5] that Lester-Mahaffey was unable to "complete a normal workday and workweek without interruptions from psychologically based symptoms." Tr. 554-55.   The record shows that Lester-Mahaffey's symptoms have not improved since 2008.

---

[4] The letter containing this opinion is signed by an LPC and a counseling intern, i.e., non-medical "other sources."   The ALJ did not take issue with that fact.   Moreover, the opinion of an "other source" may outweigh the opinion of a medical source if the other source "has seen the individual more often and has greater knowledge of the individual's functioning over time and…has better supporting evidence and is more consistent with the evidence as a whole."   SSR 06–03p, available at 2006 WL 2329939, at *6.   Here, when this letter was written, Lester-Mahaffey had been attending counseling at SARC once a week for several months, as well as attending survivor groups.   Tr. 1261.

[5] A previous ALJ's findings concerning residual functional capacity, education, and work experience are entitled to some *res judicata* consideration.   *Stubbs-Danielson v. Astrue*, 539 F3d 1169, 1173 (9th Cir 2008).   However, reassessment of a prior doctor's opinion is not included in this list of factors.   Instead, prior ALJ findings regarding a doctor's opinion are open to reinterpretation when there is new evidence that the original ALJ did not consider.   *Id.*   Here, the new evidence consists of Lester-Mahaffey's subsequent mental health treatment, including treatment at SARC.

In fact, Lester-Mahaffey testified that her condition "hasn't gotten better" and she has more non-functional days than before.   Tr. 52, 57.

The ALJ relied on the opinion of Donna Wicher, PhD, a consulting psychologist, and gave it "great weight," in particular relying on Wicher's observation that Lester-Mahaffey "described only mild deficits in her ability to perform activities of daily living from a psychological perspective."   Tr. 28, 1140.   The ALJ ignored that Lester-Mahaffey reported to Wicher that she suffered from panic attacks on an almost daily basis, which include vomiting, tearfulness, nightmares, tremulousness, tachycardia, excessive perspiration, and an urge to flee the scene.   Tr. 1138.   Wicher inexplicably ignored this detail in concluding that Lester-Mahaffey suffered from only mild deficits in daily functioning.   Moreover, when Wicher's opinion as a consulting psychologist is compared with the opinions of the SARC counselors and Dr. Maurer, who treated Lester-Mahaffey on a regular and continued basis, it is entitled to less weight.   "By rule, the Social Security Administration favors the opinion of a treating physician over non-treating physicians."   *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007)

When the record is reevaluated, after crediting Lester-Mahaffey's statements as true, the ALJ would have to award benefits.   Simply put, the ALJ erred at step five of the analysis. Lester-Mahaffey credibly testified that she is unable to work three to four days a week, and a vocational expert testified that she could not maintain those jobs that the ALJ identified in step five if she was unable to work even two to three days a week.   Tr. 64.   Finally, the court has independently reviewed the entire record and sees no basis for serious doubt that Lester-Mahaffey is disabled.[6]

[6] Lester-Mahaffey also contends that the ALJ erred in analyzing Dr. Knight's opinion.   The court does not need to reach that issue, in light of its decision to reverse and remand for the reasons

For these reasons, the decision of the Commissioner is REVERSED and REMANDED pursuant to Sentence Four, 42 USC § 405(g) for the immediate calculation and payment of benefits to Lester-Mahaffey.

Dated this 9th day of January, 2017.


/s/Youlee Yim You
Youlee Yim You
United States Magistrate Judge

discussed above.